UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: National Prescription Opiate Litigation | ) | MDL No. 1:17-cv-02804 |
| | ) | |
| THE BLACKFEET TRIBE OF THE | ) | CASE NO.  1:18-op-45749 |
| BLACKFEET INDIAN RESERVATION, | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| AMERISOURCE BERGEN DRUG | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

On August 3, 2018, The Blackfeet Tribe of the Blackfeet Indian Reservation ("Plaintiff"

or "Blackfeet Nation") filed the Corrected First Amended Complaint ("FAC") in this action. (R.

6).[1] On August 31, 2018, the Manufacturer Defendants, Distributor Defendants, Pharmacy

Defendants, and Generic Manufacturing Defendants filed Motions to Dismiss and supporting

memoranda. (R. 933-1, R. 924, R. 927, R. 930). Plaintiff filed an omnibus brief in opposition to

the Defendants' motions on October 2, 2018. (R. 1017). On October 5, 2018, an *amici curiae*

brief in opposition to Defendants' motions to dismiss was filed on behalf of 448 federally

recognized Tribes. (R. 1026). Reply memoranda were filed by the Defendants on November 2,

2018. (R. 1089, R. 1084, R. 1085, R. 1091). For the reasons stated below, it is recommended that

the motions to dismiss be GRANTED in part and DENIED in part. Specifically, it is

---

[1] This references R. 6 in the individual docket for case 1:18-op-45749-DAP.  All other record citations herein cite to
17-md-2804-DAP.

1

recommended that Plaintiff's federal common law public nuisance claim in Count Three be DISMISSED, that the claim arising pursuant to the Montana Unfair Trade Practices and Consumer Protection Act contained in Count Ten be DISMISSED, and that Plaintiff's claims against the Generic Manufacturers are partially preempted to the extent they are based on a narrow category of conduct as explained in Section III.C.2, *infra*. In all other respects, it is recommended that the motions to dismiss be DENIED.

The complaint classifies the defendants by the business activities they conduct as Marketing Defendants[2] (R. 6, ¶¶37-80) and Distributor Defendants.[3] (¶¶81-94). Three of the Distributor Defendants, CVS, Walgreens, and Walmart are also referred to collectively as National Retail Pharmacies. (¶95).

The FAC asserts the following ten causes of action:

### Federal Claims

| | |
|---|---|
| Count 1 | RICO Opioid Marketing Enterprise (against Purdue, Cephalon, Janssen, Endo, and Mallinckrodt (the "RICO Marketing Defendants") |
| Count 2 | RICO Opioid Supply Chain Enterprise (against Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) |
| Count 3 | Federal Common Law Public Nuisance (against all defendants) |

---

[2] The "Marketing Defendants" are Purdue Pharma L.P., Purdue Pharma Inc. and The Purdue Frederick Company ("Purdue") (R. 6, ¶¶38-41); ); Allergan PLC, Watson Laboratories, Inc. Actavis Pharma, Inc., Actavis, LLC. ("Actavis") (¶¶45); Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., Cephalon, Inc. ("Cephalon") (¶47-49); Johnson & Johnson, Janssen Pharmaceuticals, Inc., Noramco, Inc., Ortho-McNeil-Janssen Pharmaceuticals Inc., Janssen Pharmaceutica, Inc. ("Janssen") (¶¶51-56); Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., Par Pharmaceutical, Inc. ("Endo") (¶¶62-65); Insys Therapeutics, Inc. ("Insys") (¶69); Mallinckrodt plc, Mallinckrodt LLC, and SpecGX LLC ("Mallinckrodt"). (¶72).

[3] The "Distributor Defendants" are Cardinal Health, Inc. ("Cardinal") (¶82); McKesson Corporation ("McKesson") (¶83); AmerisourceBergen Drug Corporation ("AmerisourceBergen") (¶85); CVS Pharmacy, Inc., CVS Indiana, L.L.C. ("CVS") (¶ 86), Walgreen Co, Walgreen Arizona Drug Co. ("Walgreens") (¶87); Walmart Inc. ("Walmart") (¶88); Advantage Logistics (¶89); Alberson's LLC ("Albertson's") (¶90); Anda Pharmaceuticals, Inc. ("Anda") (¶91); Associated Pharmacies, Inc. ("Associated Pharmacies") (¶92); Dakota Drug, Inc. ("Dakota Drug") (¶93), Smith's Food & Drug Centers, Inc. ("Smith's"). (¶94).

State Law Claims

Count 4        Common Law Public Nuisance (against all defendants)

Count 5        Statutory Public Nuisance (against all defendants)

Count 6        Negligence and Negligent Misrepresentation (against all defendants)

Count 7        Common Law Fraud (against Purdue, Actavis, Cephalon, Janssen, Endo, Insys, and Mallinckrodt)

Count 8        Unjust Enrichment (against all defendants)

Count 9        Civil Conspiracy (against all defendants)

Count 10       Violations of Montana Unfair Trade Practices and Consumer Protection Act, MCA § 30-14-101, et seq. (against all defendants)

## I.     Fed. R. Civ. P. 12(b)(6) Standard

Under the standards guiding review of a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a

court "accepts all factual allegations as true." *Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007).

"'[A] legal conclusion couched as a factual allegation," however, is not entitled to that

assumption. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp v. Twombly*,

550 U.S. 544, 555 (2007).  Fed. R. Civ. P. 8(a)(2) requires "a short and plain statement of the

claim showing that the pleader is entitled to relief." The Rule "marks a notable and generous

departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the

doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, at 678-679.

Nor will a complaint suffice if it relies on "'a formulaic recitation of the elements of a cause of

action'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (quoting

*Twombly*, 550 U.S. at 555, 557).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*] at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

> defendant is liable for the misconduct alleged. *Id.,* at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.*

*Id.* at 678. "[A] district court may dismiss a complaint for failure to state a claim 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) (quoting *Swierzkiewickz v. Sorema N.A.*, 534 U.S. 506, 514 (2002); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## II.  Factual Allegations of the FAC[4]

### A.  The Developing Increase in Opioid Use/Abuse and Overdose Deaths

The FAC alleges that a "push to expand opioid use" commenced in the late 1990s, resulting in a steadily rising death toll from opioid overdoses in this country (from 8,000 in 1999, over 20,000 in 2009, over 33,000 in 2015, and 45,000 from September 2016 to September 2017—in all 350,000 deaths attributable to opioid overdoses of which 200,000 involved prescription opioids). (R. 6, ¶¶4-6). Further, "80% of people who initiated heroin use in the past decade started with prescription opioids." (¶6).

### B.  Allegations of an Intentional Campaign to Increase Opioid Use

Plaintiff alleges that despite knowing that opioids were "highly addictive and prone to result in dependence and abuse" the Manufacturers, in order to increase sales, undertook a "massive marketing campaign premised on false and incomplete information," in which they

---

[4] This report and recommendation provides only a brief overview of the allegations in the nearly 340-page FAC. Further, the substance of the allegations are largely the same as those found in another case in this multi-district litigation that were set forth in a previous report and recommendation. *See In re Nat'l Prescription Opiate Litig.*, No. 1:18-OP-45090, 2018 WL 4895856 (N.D. Ohio Oct. 5, 2018), *report and recommendation adopted in part, rejected in part*, No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018). Hereafter, the court refers to that report and recommendation and ensuing decision collectively as "*Summit County*," but citations to specific portions of those opinions utilize the court docket's record/document ("R.") and page identification (PageID#) numbering systems. The court reiterates only the general allegations herein and focuses more on those allegations unique to the case at bar.

4

"relentlessly and methodically, but untruthfully" minimized the risk of addiction when opioids were used to treat chronic pain and overstated the benefits of opioid use. (¶¶10, 12). The goal of the marketing campaign, to convince doctors to change their prescribing practices, was successful, as prescription opioid sales in the U.S. nearly quadrupled between 1999 and 2015. (¶¶13-14). Plaintiff also alleges that the Distributors[5] played a role in marketing and promoting prescription opioids and contracted for payment to do so. (¶469). Other alleged promotional related acts by Distributors include "create[ing] and sponsor[ing] training materials for [pro-opioid Key Opinion Leader physicians] intended to help opioid manufacturers get opioids on the formularies for third party payors;" proposing marketing initiatives; and coordinating marketing messages with Manufacturers. (¶¶470-473, 319). Manufacturers allegedly created nine categories of misrepresentation in furtherance of their campaign to increase opioid use, utilizing "front groups" and "key opinion leaders" (KOLs) to spread their misrepresentations. It is further alleged these front groups and KOLs were controlled and/or funded by Manufacturers but acted under the guise of independent third parties, and that Manufacturers expended millions of dollars on both branded and unbranded advertising. Finally, it is alleged that Defendants violated federal, statutory, and common law duties by failing to curb or report diversion of opioids—all with the aim of raising quotas and expanding their sales.

### C. Allegations of Harm

The FAC asserts that the opioid epidemic particularly devastates the Blackfeet Nation and its members and citizens, citing a 2014 U.S. Department of Health study finding that Native Americans accounted for 23.4% of substance abuse treatment admissions for opiates in Montana

---

[5] Although classified in the complaint as both National Retail Pharmacies and Distributor Defendants, CVS, Walgreens, and Walmart moved separately to dismiss. In the Analysis section, the court differentiates between these two categories by referring to them either as "Distributors" or "Pharmacies." For the purposes of this section only, the Plaintiff's references to the Distributor Defendants in the complaint includes the Pharmacies.

and 9.6% for heroin. (¶¶681-682). It also cites statistics showing that 44% of pregnant women on the Blackfeet reservation tested positive for opioid use; 56% of Blackfeet Nation newborn infants are born with an addiction condition; 6% of 10th graders at school, located on the Blackfeet Reservation, reported non-heroin opioid use in their lifetime; and 5,500 needles were distributed in the first year of a Blackfeet Nation needle exchange program. (¶¶566, 686-687). Plaintiff alleges that it has incurred substantial expenses in addressing the opioid crisis including the costs of medical, rehabilitation and prevention services; education and naloxone training for families; and increased fire, emergency, law enforcement and criminal justice system services (¶¶678-679); and it further alleges that it does not have the resources to overcome these issues (¶694).

## III.    Analysis

### A.  Statute of Limitations

Manufacturers move to dismiss on the grounds that the complaint, filed June 26, 2018, facially demonstrates that Plaintiff's federal and state law claims accrued well before the governing two-year to four-year statutes of limitations, asserting that the claims fail as a matter of law because Plaintiff fails to establish an exception that would save them. (R. 933-1, PageID# 21269-21277; R. 1089, PageID# 27253-27260). Plaintiff maintains that the fraudulent concealment and continuing violation tolling doctrines suspend operation of the applicable statutes and raise factual questions. (R. 1017, PageID# 24569-24575).[6]

Dismissal under Fed. R. Civ. P. 12(b)(6) based on a statute of limitations defense is

---

[6] Plaintiff advances a theory that as a sovereign, the *nullum tempus* doctrine immunizes its claims from the operation of statutes of limitations. (R. 1017, PageID# 24569-24570). The argument is not persuasive because Montana law provides, "The limitations prescribed in part 2 of this chapter apply to actions brought in the name of the state or for the benefit of the state in the same manner as to actions by private parties." Mont. Code Ann. § 27-2-103; *see also Caterpillar Tractor Co. v. Dep't of Revenue of State of Mont.*, 633 P.2d 618, 622 (Mont. 1981) ("Section 27-2-103, MCA . . . provides that the statutes of limitations are applicable to the State of Montana."). (R. 1089, PageID# 27253-27254).

appropriate only if the complaint affirmatively demonstrates that the claim is time-barred. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012), *cert. denied,* 568 U.S. 1157 (2013). Under Montana law, a limitation period does not commence "until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party" if the underlying facts "are by their nature concealed or self-concealing" or if "the defendant has taken action which prevents the injured party from discovering the injury or its cause." Mont. Code Ann. § 27-2-102(3); *McCormick v. Brevig*, 980 P.2d 603, 619-620 (Mont. 1999). Montana law also holds that limitations periods applicable to equitable nuisance claims are tolled "until the source of the injury is abated." *Knight v. City of Missoula*, 827 P.2d 1270, 1277 (Mont. 1992).

The FAC alleges that in the absence of ARCOS data that was unavailable prior to the District Court's April 18, 2018 Order, reasonable diligence could not have enabled earlier discovery of the misconduct Defendants allegedly concealed, including their failure to comply with suspicious order reporting obligations, while making false assurances to the contrary.  (R. 6, ¶¶723-731; *see also* ¶¶474-635). Plaintiff further alleges that Defendants' "ongoing course of conduct knowingly, deliberately and repeatedly threatened and accomplished harm and risk of harm to public health and safety." (R. 6, ¶734; *see also, e.g.,*  ¶¶4, 21, 721-722, 740-741, 746, 751-757, 777, 784, 845, 875, 945-950, 966-969, 1032, 1064, 1083-1084, 1102).

Analyzing the same arguments raised in *Summit County* and *Muscogee Nation* in support of and opposition to the Manufacturers' motion to dismiss, and based on the same allegations asserted by the plaintiffs in *Summit County*, the court concludes that none of their claims should be dismissed because the facts alleged supports a plausible inference that the applicable limitations periods were subject to tolling — "either under a fraudulent concealment theory or a

continuing violation theory." (R. 1025, PageID# 24861-24862 as adopted by R. 1203, PageID# 29024-29025). For the same reasons, Plaintiff's claims survive the Manufacturers' motion to dismiss on statute of limitations grounds.

Plaintiff alleges damages that it has incurred addressing the opioid crisis that are substantively similar to those pled in *Summit County*. They include costs of providing emergency, law enforcement, and criminal justice services, among others, that are allegedly attributable to Defendants' "ongoing and persistent" misconduct. (*E.g.,* R. 6, ¶¶19-20, 678-679, 852, 883, 969, 1032-1033, 1062, 1083, 1102). Manufacturers and Pharmacies contend that recovery of these damages is barred by the municipal cost recovery rule, also known as the free public services doctrine. (R. 933-1, PageID# 21234-21236; R. 1089, PageID# 27224-27226; R. 927-1, PageID# 21085; R. 1085, PageID# 27056-27058).[7] The reasoning and conclusion of the court in *Summit County* applies here, *i.e.,* the rule does not bar recovery under Plaintiff's federal RICO claims, Counts One and Two. (R. 1203, PageID# 29036-29039; *see also* R. 1025, Page ID# 24823-24828). The court also declines to apply the rule to Plaintiff's state law claims and concludes, pursuant to its prior holding, that the costs of Plaintiff's governmental services are recoverable to the extent that they exceed the ordinary costs of providing those services and evidence establishes that they were incurred due to the Defendants' violation of state law. (R. 1203, PageID# 29037-29038).

---

[7] The Pharmacy Defendants refer to "Major Distributors' *Chicago* Brief (Part III.C); Moving Defendants' *Chicago* Brief (Part VIII)." (R. 927-1, PageID# 21085). Plaintiff "incorporates by reference the *Chicago* Opp. Mem. 36-37 and the *Cabell* Opp. Mem. 36-38." (R. 1017, PageID# 24575). The referenced briefs in other actions raise the same or similar arguments as those advanced in this action (except for state specific citations), none raise any argument that would change the analysis.

### B.  Federal RICO Claims – Counts I and II

Plaintiff pleads two claims pursuant to the Racketeer Influenced and Corrupt

Organizations (RICO) Act § 1961 *et seq.* Count I of the complaint asserts civil RICO violations

against the "RICO Marketing Defendants"[8] who, joined by front groups and KOLs, formed an

association-in-fact "Opioid Marketing Enterprise" that they used "to engage in a scheme to

unlawfully increase their profits and sales, and grow their share of the prescription painkiller

market, through repeated and systematic misrepresentations about the safety and efficacy of

opioids for treating long-term, chronic pain," which "fueled the U.S. opioids epidemic." (R. 6,

¶¶764-765, 828-855). Count II alleges that the "RICO Supply Chain Defendants"[9] operated an

association-in-fact "Opioid Supply Chain Enterprise" that was "formed for the purpose of

unlawfully increasing sales, revenues and profits by fraudulently increasing the quotas set by the

DEA that would allow them to collectively benefit from a greater pool of prescription

opioids….jointly agree[ing] to disregard their statutory duties to identify, investigate, halt and

report suspicious orders of opioids and diversion of their drugs into the illicit market" and

through that enterprise created the opioid epidemic. (¶¶804, 809, 878, 882, 856-887). The FAC

also alleges that the Defendants were filling suspicious orders on a "daily basis-leading to the

diversion of hundreds of millions of doses of name-brand and generic prescription opioids into

the illicit market." (¶ 869).

### 1. Previously Addressed Arguments

The Defendants charge that Plaintiff's RICO claims fail because they do not adequately

plead the following: (1) standing, (2) causation, (3) the existence of an enterprise, and (4)

predicate acts. They further contend that the Complaint fails to satisfy Fed. R. Civ. P. Rule 9(b)'s

---

[8] Purdue, Cephalon, Janssen, Endo, and Mallinckrodt. (R. 6, ¶ 764 n. 299).
[9] Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen. (R. 6, ¶ 799).

particularity requirement or to sufficiently differentiate among the Defendants with respect to their allegations.[10] The undersigned has addressed this same issue in the *Muscogee Nation* action and found it not persuasive. The parties' briefings in this action have not changed that recommendation. Previously in this MDL, the court had occasion to address all these arguments when addressing the motions for dismissal in *Summit County*. (R. 1025 & 1203). The issue of RICO standing, including whether an injury to business or property was alleged or whether the plaintiffs' injuries were based on personal injuries, was addressed in detail. (R. 1025, PageID# 24818-24830, *adopted by* R. 1203, PageID# 29029-29039). Causation (R. 1025, PageID# 24830-24842), the existence of an enterprise (*Id.*, PageID# 24842-24845), and predicate acts were also addressed. (*Id.*, PageID# 24845-24854). The court also rejected the Rule 9(b) arguments, observing that "courts have relaxed Rule 9(b)'s heightened pleading requirements in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and involving thousands of billing documents." (R. 1025, PageID# 24845-24846, *quoting In re U.S. Foodservice Inc. Pricing Litig.*, 2009 WL 5064468, at *18 (D. Conn. Dec. 15, 2009)). Defendants either did not object to the court's recommendations or their objections were overruled. (R. 1203).

After reviewing the Defendants' briefs and replies herein, the court finds nothing materially new in these arguments. Given that the FAC tracks the allegations in *Summit County*, the court finds no reason to reiterate in any detail its recommendation that these arguments should again be rejected.[11]

---

[10] *See* R. 933-1 and R. 1089 (Manufacturers), R. 924 and R. 1084 (Distributors); R. 927-1 and 1085 (Pharmacies); R. 931-1 and 1091 (Generic Manufacturers).

[11] The present action was instituted in the United States District Court for the District of Montana, within the Ninth Circuit, while *Summit County* originated in this District within the Sixth Circuit. To the extent there is any discrepancy in these Circuits' respective interpretation of federal law, "in a federal multidistrict litigation there is a preference for applying the law of the **transferee** district …." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 912 (6th Cir. 2003) (emphasis added) (*citing In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 97 F.3d

### 2. New Arguments

#### a. The Nation as a Sovereign and RICO Standing

The Distributors raise another standing challenge that was not addressed in *Summit County*. They assert that in seeking to vindicate sovereign interests, Plaintiff does not qualify as a "person" within the meaning of the RICO Act. They draw upon case law addressing a presumption that a sovereign is not considered a "person" in certain contexts, citing *Inyo County v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 711 (2003).[12] (R. 924, PageID# 20991 & n. 5; R. 1084, PageID# 27012-27013). Plaintiff responds that it does not seek recovery purely for its sovereign interests as *parens patriae* for injury to its economy, but also brings this action in its proprietary capacity for losses to its own property. (R. 6, ¶¶678, 679, 690; R. 1017, PageID# 24548-24551); *see Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 103 F. Supp. 2d 134, 149 (N.D.N.Y. 2000), *judgment aff'd*, 268 F.3d 103 (2d Cir. 2001) (holding that a foreign sovereign is a "person" for RICO purposes). The undersigned has addressed this same issue in the *Muscogee Nation* action and found it not persuasive. The parties' briefings in this action have not changed that recommendation.[13]

---

1050 (8th Cir. 1996); *Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993)). "In an MDL proceeding, the transferee court applies the federal law of the circuit in which it is located…. Thus, **to the extent differences exist among jurisdictions, Sixth Circuit law controls.**" *In re Vertrue Mktg. & Sales Practices Litig.*, 712 F. Supp. 2d 703, 712 (N.D. Ohio 2010) (Gaughan, J.) (emphasis added), *aff'd sub nom. In re Vertrue Inc. Mktg. & Sales Practices Litig.*, 719 F.3d 474 (6th Cir. 2013). Moreover, "[a]pplying divergent interpretations of the governing federal law to plaintiffs, depending solely upon where they initially filed suit, would surely reduce the efficiencies achievable through consolidated preparatory proceedings." *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (Ginsburg, J.) ("Indeed, because there is ultimately a single proper interpretation of federal law, the attempt to ascertain and apply diverse circuit interpretations simultaneously is inherently self-contradictory."), *aff'd sub nom. Chan v. Korean Air Lines*, Ltd., 490 U.S. 122, 109 S. Ct. 1676, 104 L. Ed. 2d 113 (1989).

[12] *See also Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780 (2000) (applying the "longstanding interpretive presumption that "person" does not include the sovereign" to conclude that a State is not a "person" subject to *qui tam* liability under the federal False Claims Act). (R. 924, PageID# 20911 n.5; R. 1084, PageID# 27012-27013).

[13] Manufacturers also assert that the Medical Cost Recovery Act bars Plaintiff's claims to the extent Plaintiff seeks to recover medical expenses associated with alleged state law claims. The court found this argument unavailing in

**C. Preemption**

**1. Manufacturers' arguments**

Manufacturers seek dismissal of Plaintiff's state law claims on preemption grounds, arguing that the Court "should hold that the [Plaintiff's] claims are generally preempted and that, at a minimum, they are preempted to the extent that they seek to impose liability for the Manufacturers' marketing of opioids (1) for the treatment of chronic pain, and (2) without limitation on dosages or duration of treatment." (R. 1089, PageID# 27246).[14] As an initial matter, Plaintiff asserts that its "claims do not turn on the contention that these Defendants should not have marketed their opioid[] products for non-cancer chronic pain." (R. 1017, PageID# 24557). Rather, Plaintiff alleges that "Manufacturer Defendants were precluded from using falsehoods and misrepresentations in such marketing" and notes that "the gravamen of Plaintiff's claim is not the promotion of opioids for non-cancer long-term use, but rather promotion for that use (and others) through fraudulent misrepresentations." *Id.* The court does not interpret the FAC as solely alleging that the Manufacturers' liability is based on promoting their prescription opioids for non-cancer pain, but finds that the FAC avers facts well-beyond such particular allegations, including that the Manufacturers aggressively marketed their opioids in such a manner as to lead to a deluge of opioids in communities that resulted in an illicit secondary market and caused extraordinary economic and human harms. Therefore, consistent with the court's opinion in *Summit County*, the court denies the Manufacturers' maximal claim, that Plaintiff's state law claims are "generally preempted." (R. 1025, PageID# 24854-56, pp. 48-50).[15]

---

the Report and Recommendation in *Muscogee Nation* at section IV.G, 1:18-op-45459, and the same result is adopted herein by reference.

[14] The Manufacturers point to several particular allegations in the Complaint that refer to these assertedly preempted bases of liability.  *See* R. 933-1, PageID# 21258-59, n. 13, 14.

[15] The Manufacturers also argue that the Plaintiff "effectively concedes that the Manufacturers cannot be liable for simply representing that opioids can be safe and effective for the treatment of chronic, non-cancer pain." (R. 1089,

Manufacturers argue that Plaintiff's state-law claims seeking to impose liability for marketing opioids for the treatment of chronic, non-cancer pain and for failing to include in their labeling limitations on dosage or duration of opioid treatment are preempted because it would be impossible for the Manufacturers to comply with both their federal law requirements and any state law judgments arising from those claims. (R. 933-1, PageID# 21254).[16] They argue an FDA letter responding to a 2012 citizen petition from a group known as Physicians for Responsible Opioid Prescribing (the "PROP Petition") provides "clear evidence" of preemption.

For the reasons explained when addressing this same argument in this court's Report and Recommendation filed this same date in the *Muscogee Nation*, Manufactures' argument is not well-taken. The court is unable to conclude that the PROP letter satisfies the clear evidence standard from *Wyeth v Levine*, 555 U.S. 555, 571 (2009). It is not apparent that the FDA letter could have preemptive effect because Plaintiff herein is not seeking opioid label changes, but to hold Defendants liable for making allegedly false and misleading statements as set forth in the nine categories of misrepresentations. Moreover, the court cannot rule on the alleged preemptive effect of the FDA letter in a vacuum, ignoring material factual issues and without the benefit of a full record. Further, it is apparent that even if the court were to agree with the Manufactures arguments that the FDA letter has some preemptive effect, it is apparent that no reasonable interpretation would preempt each theory of liability presented by the Plaintiffs. Therefore, consistent with the recommendation in *Muscogee Nation*, the court recommends against finding any preemption of Plaintiff's state-law claims based on the PROP letter.

---

PageID# 27243. The Court does not construe the Plaintiff's brief as offering such a concession. However, after discovery, Plaintiff may narrow its claims and the Manufacturers may renew their arguments upon a full record.

[16] The Manufacturers also argue that "any surviving claims premised on alleged marketing misrepresentations are preempted to the extent the relevant representations are ones a pharmaceutical manufacturer could not alter without violating federal law." *Id.*

### 2. Generic Manufacturers' argument

The Generic Manufacturers move to dismiss Plaintiff's state law claims on preemption grounds. Their preemption arguments are substantially identical to those they raised in the *Muscogee* case, namely that Plaintiff's marketing-based claims are preempted because it would be impossible for the Generic Manufacturers to comply with the duties Plaintiff alleges while also abiding by the FDA's rule of "sameness" that requires generic manufacturers' labeling and marketing materials to be the same as those of their branded equivalents.  (R. 930-1, PageID# 21172-75).

Plaintiff's position is essentially the same as expressed by the plaintiff in *Muscogee Nation*. It argues that the Supreme Court and 6th Circuit jurisprudence on this issue allows a generic manufacturer to transmit "Dear Doctor" letters clarifying the warnings that the FDA has already improved for the branded manufacturers and correcting other marketing misrepresentations made by the branded manufacturers so long as the generic manufacturer does not include any new or different information in those letters.  (R. 1017, PageID# 24564-67). Plaintiff claims that:

> Such correctives would not have needed to contradict or even supplement the label; instead they would simply have reinforced and reinstated the impact of the warnings that were already there.  Nor would such correctives have implied a therapeutic difference between the branded and generic versions of the drugs because the correctives would merely have reiterated information that was already contained in the labels for both branded and generic opioids.

(R. 1017, PageID# 24565-66).

For reasons explained more fully in its report and recommendation in the *Muscogee Nation* case, the court rejects Plaintiff's argument, because it is not possible for such "Dear Doctor" letters to achieve their intended purpose without conveying information—that in substance, means and method of communication—violates the sameness principle. (*See*

*Muscogee Nation* at section IV.E). Therefore, claims under that narrow theory would be preempted.

Plaintiff, however, also argues that its state-law claims are based on marketing misrepresentations and are not preempted. It asserts that "[n]o federal law or regulation required the Generic Manufacturers to make false and fraudulent misrepresentations that had not been approved by the FDA and did not appear in the approved drug labels.  (R. 1017, PageID# 24561-62). The Generic Manufacturers maintain that, by the nature of the business model of a generic manufacturer, they did not market or promote the opioids that they sold. (R. 930, PageID# 21170-71). They further assert the FAC contains no allegations that they did engage in marketing, but "attempts to mask this deficiency by engaging in improper group pleading" (*Id.* at PageID# 21171), fails to differentiate among the individual Generic Manufacturer Defendants, and "lumps together all the Generic Manufacturers with other unrelated manufacturers of opioids as "Marketing Defendants...." (*Id.*) The court recognizes that, unlike the *Muscogee Nation* complaint, Plaintiff did not structure its complaint with specific allegations against the Generic Manufacturers. Plaintiff's FAC, however, contains plausible allegations against all manufacturers, which includes the Generic Manufacturers; and merely denying those allegations creates material issues of fact not suitable for resolution on a motion to dismiss.

### D.  Counts Three, Four, and Five: Public Nuisance

#### 1.  Count III: Federal Common Law Public Nuisance

Plaintiff asserts a nuisance claim based on federal common law, which they reason is appropriately invoked because Defendants' alleged conduct is interstate in nature and creates the types of nuisances which require "the need for a uniform rule of decision." *See Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6 (1972) (R.1017, PageID# 24611). Contending that its status as

15

a sovereign implicates "uniquely federal interests," Plaintiff stresses that Defendants' alleged actions and their consequences were, and are, "inherently transboundary in nature," "driven by national policies, coordination, plans, and procedures that were carefully crafted and implemented using national, regional, state, and local prescriber- and patient-level data" while prescriptions "manufactured and distributed in one jurisdiction were regularly transported for sale in another." (R. 6, ¶¶475, 543, 636-650, 896-897). *See Tex Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981); *see also Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991) (R.1017, PageID# 24611).[17]

The Manufacturers argue that this is not an appropriate case for the application of federal common law, maintaining that it should be invoked "only in a few restricted instances" and only where "there is a significant conflict between some federal policy or interest and the use of state law." *FDIC v. AmFin Fin. Corp.*, 757 F.3d 530, 535 (1994) (R. 933-1, PageID# 21249-50). They cite U.S. Supreme Court precedent explaining that the need for a federal rule of decision arises only in "disputes between two states or between states and the federal government." (R. 933-1, PageID# 21249-50, citing *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 at 421-422 (2011)).

Although federal courts have created a federal common law of public nuisance, it does not follow that this court must apply it in this case. The cases Plaintiff cite do not provide a persuasive basis for doing so here. Quoting *Texas Industries*, Plaintiff asserts that this case "implicates uniquely federal interests" of the sort that only a federal rule of decision can protect. 451 U.S. 630 at 640. (R. 1017, PageID# 24611). While *Texas Industries* referred to that general standard, the Court also clarified and narrowed the circumstances in which its application is

---

[17] Plaintiff cites *Oklahoma Tax Commission,* a case that makes no mention of federal common law, solely for the proposition that "Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories." *See* 498 U.S. at 509. (R. 1017, PageID# 24611). This status, without more, does not trigger the application of federal common law to this dispute. *See Texas Industries*, 451 U.S. 630, 641.

appropriate.

> The vesting of jurisdiction in the federal courts does not in and of itself give rise to authority to formulate federal common law, nor does the existence of congressional authority under Art. I mean that federal courts are free to develop a common law to govern those areas until Congress acts. Absent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases.

451 U.S. 630 at 641.

This case does not fall into any of those categories. Plaintiff cites *Illinois v. City of Milwaukee*, but that case is inapposite as it involved a dispute between a state and four cities of a neighboring state that were alleged to have polluted interstate waters of the United States, thus creating a nuisance within the plaintiff's state boundaries. The Court explained that federal common law applied where the dispute implicated interstate bodies of water, a subject inherently federal in nature,[18] as well as conflicting rights of states. 406 U.S. at 94-97; *see also Texas Industries*, 451 U.S. 630, 640. In contrast, the dispute between Plaintiff and private actors raises no such state conflict.

Therefore, it is recommended that Plaintiff's Third Claim for Relief asserting a federal public nuisance be dismissed.

### 2. Counts IV and V: Montana Common Law and Statutory Public Nuisance

Plaintiff alleges that the opioid epidemic is a continuing, but abatable, public nuisance allegedly created by the Defendants' "ongoing conduct of marketing, distributing, and selling opioids, which are dangerously addictive drugs, in a manner which caused prescriptions and

---

[18]The court explained, "Rights in interstate streams, like questions of boundaries, have been recognized as presenting federal questions. The question of apportionment of interstate waters is a question of federal common law, upon which state statutes or decisions are not conclusive." *City of Milwaukee,* 406 U.S. at 105 (internal citations and quotation marks omitted).

17

sales of opioids to skyrocket in Plaintiff's Community, flooded Plaintiff's Community with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiff and the residents of Plaintiff's Community." (R. 6, ¶¶ 924, 926-927, 966-967; *see also, e.g.,* 33-35, 141-143). The FAC alleges that as a federally recognized tribe, the Nation has "sovereign power" to, *inter alia,* make and operate its own government and seek legal redress for injuries to itself and its members and "is responsible for the public health, safety and welfare of its citizens." (¶¶31-32). The FAC pleads a common public nuisance claim (Count IV) and asserts a separate cause of action under Mont. Code Ann. 27-30-101 *et seq.* (Count V). (R. 6, ¶¶825-974). Defendants have moved to dismiss each count.[19]

The Manufacturers and Distributors assert that Count IV should be dismissed because Montana does not recognize a freestanding cause of action for "common law public nuisance," but rather defines the law by statute. (R. 933-1, PageID# 21250; R. 1089, PageID# 27240; R. 1084, PageID# 27023, citing Mont. Code Ann. 27-30-101 *et seq.*). In doing so, the Montana nuisance statute incorporates the common law. *Belue v. State*, 649 P.2d 752, 754 (Mont. 1982) (explaining that provisions addressing public and private nuisance liability "are, in effect, but crystallizations of the common law and are consistent with the general rules which have long been recognized by the courts") (internal quotation marks and citations omitted). It does not reflect an intent to dispense with the common law cause of action. *Haker v. Sw. Ry. Co.*, 578 P.2d 724, 727 (Mont. 1978) ("For the written law to effect a repeal of (the common law), ... the

---

[19] The Manufacturers' arguments are found at (R. 933-1, PageID# 21245-21250; R. 1089, PageID# 27235-27240); Distributors' arguments at (R. 924, PageID# 20997-21000; R. 1084, PageID# 27023-27026); Pharmacies' arguments at (R. 927-1, PageID# 21070-21074; R. 1085, PageID# 27044-27047); Generic Manufacturers arguments (R. 930, PageID # 21169-21177; R. 1091); Plaintiff's Opposition (R. 1017, PageID# 24616-24630).

intent of the legislature to bring about the change must be clear; and, if the intent be not fairly evident, the common law remains the rule of decision.").

The cases cited by the parties does not resolve their dispute as to whether the common law claim may be sustained. Rather, it suggests that, however denominated, a public nuisance claim will be subject to the provisions of the Montana nuisance statute as informed by common law principles that are recognized by Montana law. Because the Defendants' arguments do not demonstrate that dismissal of the common law public nuisance claim is mandated, and because Fed. R. Civ. 8(d)(2) permits alternative or hypothetical statements of a claim in separate counts, the court declines to dismiss Count IV at the pleading stage.

### a. Montana Public Nuisance Law

Montana's Public Nuisance statute provides,

(1) Anything that is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or that unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, river, bay, stream, canal, or basin or any public park, square, street, or highway is a nuisance.

(2) Nothing that is done or maintained under the express authority of a statute may be deemed a public or private nuisance.

Mont. Code Ann. ("M.C.A.") 27-30-101(1)(2). It defines a public nuisance as "one which affects, at the same time, an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." *Id.*, 27-30-102.

Defendants maintain that Plaintiff's causes of action sound in products liability, not nuisance, arguing that Plaintiff seeks economic damages for derivative expenses arising from the marketing and sale of allegedly harmful products and injuries to consumers. (R. 933-1, PageID# 21247-21249; R. 1089, PageID# 27235-27237; R. 924, PageID# 20999). They contend that the

claims should be dismissed because there is no Montana Supreme Court precedent affirming either the viability of a claim that "collapses the critical distinction between nuisance and products liability law" or a claim that is not based on interference with land or real property rights. For this federal court to conclude otherwise, they argue, would result in an expansive and inadvisable substantive innovation of state law. *See, e.g. Camden County Board of Chosen Freeholders v. Beretta, U.S.A. Corp.,* 273 F.3d 536, 540 (3d Cir. 2001); *Berrington v. Wal-Mart Stores*, *Inc.,* 696 F.3d 604, 608 (6th Cir. 2012). Plaintiff counters that Defendants' arguments misconstrue the complaint's theory of public nuisance liability and that Montana law is not limited to the property context. (R. 1017, PageID# 24621-24626).

In the absence of a Montana Supreme Court decision addressing the products liability and property limitation issues, it is the court's role to predict how that court would rule, guided by sources that include "the decisions (or dicta) of the [State] Supreme Court in analogous cases, pronouncements from other [of the State's] courts, restatements of law, commentaries, and decisions from other jurisdictions." *See State Auto Prop. & Cas. Ins. Co., v. Hargis,* 785 F.3d 189, 195 (6th Cir. 2015); *Pittman v. Experian Info. Sols., Inc.,* 901 F.3d 619, 636 (6th Cir. 2018) ("The Court may use the decisional law of the state's lower courts [and] other federal courts construing state law ….").

### b. Products Liability Limitation

Arguing that Plaintiff's claims "are essentially products liability claims for economic damages masquerading under the guise of nuisance law," Manufacturers cite cases that refused to subject manufacturers to nuisance liability based on their production or sale of products "however harmful." (R. 933-1, PageID# 21245-21249), citing *State v. Lead Indus. Ass'n, Inc.,*

951 A.2d 428, 452-457 (R.I. 2008)).[20] There, the court distinguished the two bodies of law, explaining, "[p]ublic nuisance focuses on the abatement of annoying or bothersome activities[,] [p]roducts liability law, on the other hand, has its own well-defined structure, which is designed specifically to hold manufacturers liable for harmful products that the manufacturers have caused to enter the stream of commerce." *Id.* at 456.

Plaintiff maintains that its nuisance claims are not concerned with the legal manufacture, distribution, and sale of legal products lawfully placed in the stream of commerce, but rather are based on the Defendants' affirmative unlawful conduct in carrying out those activities, *i.e.* deceptive promotion and the failure to comply with anti-diversion laws and regulations. (*E.g.,* R. 6, ¶¶929-940, 966-967, *see also* ¶29). A Montana trial court decision confirms the viability of that theory, rejecting defendants' argument that the sale of tobacco products, an activity authorized by Montana law, could not constitute a nuisance. *See State of Montana v. Phillip Morris, Inc.*, 1998 Mont. Dist. LEXIS 732, at *30-31 (1st Judicial Dist. Ct. Mont., Lewis & Clark Cty. Sept. 22, 1998). (R. 1017, PageID# 24621-24622, 24628). The court concluded,

> The State's nuisance claim, however, is not based on the sale of tobacco products. Rather, it is based on Defendants' alleged deceitful and misleading conduct in promoting tobacco products; the alleged deceptive manipulation of nicotine in tobacco products; the alleged targeting of minors; and alleged misrepresentation to the public regarding the safety of tobacco products. Since the State's claim is not based on the sale of tobacco products but on the methods utilized by the Defendants in marketing those products or suppressing information, the Court concludes that the State has adequately pled a cause of action for public nuisance and that it should not be dismissed.

*Id.*; *People v. ConAgra Grocery Prod. Co.,* 227 Cal. Rptr. 3d 499, 593-594, 598 (Cal. Ct. App.

---

[20] Defendants also cite the following: *Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001); *Ashley County v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009); *City of Perry v. Procter & Gamble Co.*, 188 F. Supp. 3d 276, 291 (S.D.N.Y. 2016); *Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513, 520 (Mich. Ct. App. 1992); *In re Lead Paint Litig.*, 924 A.2d 484, 505 (N.J. 2007); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004).

2017) (affirming verdict holding lead paint manufacturers liable for the cost of remediating pre-1951 homes based on their affirmative promotion of lead paint use for interior residential use despite having actual knowledge of the product's risk of serious harm), *cert. denied,* 139 S. Ct. 377 (2018). The *ConAgra* decision rejected the defendants' argument that plaintiff's public nuisance claim sounded in products liability, explaining, that "[h]ere, the alleged basis for defendants' liability for the public nuisance created by lead paint is their affirmative promotion of lead paint for interior use, not their mere manufacture and distribution of lead paint or their failure to warn of its hazards." *Id.* at 529 (internal quotation marks and citation omitted).[21]

Decisions from the California Court of Appeal are relevant to determining how the Montana Supreme Court would likely rule on issues arising under the Montana nuisance statute because the Montana legislature adopted the California nuisance statute at issue in *ConAgra* and *County of Santa Clara* and Montana courts look to California's construction of its statute for guidance.[22] *See Tally Bissell Neighbors, Inc. v. Eyrie Shotgun Ranch, LLC*, 228 P.3d 1134, 1140 (Mont. 2010) ("Montana adopted § 27–30–102, MCA, verbatim from California Civil Code § 3480. This Court follows the construction placed on the statute by the highest court of the state that first enacted the statute. *Barnes,* ¶ 19.").

Defendants' arguments do not support a conclusion that Plaintiff's nuisance claims are in essence product liability claims. The FAC clearly alleges that the nuisance arises from the

---

[21] *See also Gov't of United States Virgin Islands v. Takata Corp.*, 2017 WL 3390594, at *43 (V.I. Super. June 19, 2017) (rejecting argument that plaintiffs "brought a product liability claim under the guise of public nuisance" where the allegations pertained to defendants' affirmative misrepresentation and concealment of a known "defect rather than [defendants'] initial manufacture and placement of the defective product in the stream of commerce."); *County of Santa Clara v. Atl. Richfield Co.*, 40 Cal. Rptr. 3d 313, 329 (Cal. Ct. App. 2006) ("A products liability action does not provide an avenue to prevent future harm from a hazardous condition, and it cannot allow a public entity to act on behalf of a community that has been subjected to a widespread public health hazard.).

[22] A 1996 amendment to the California statute added the phrase "including, but not limited to, the illegal sale of controlled substances," to the definition of nuisance (1996 Cal. Legis. Serv. Ch. 658 (A.B. 2970)). With that exception, Cal. Civ. Code §§ 3479-3482 and M.C.A. 27-30-101(1)(2) & 27-30-102(1)(2) are the same.

Defendants' conduct, not harm from a legal product that they merely placed into the stream of commerce, and it also alleges that Plaintiff seeks to abate the nuisance. (*E.g.,* R. 6, ¶¶35, 952, 966). That theory of nuisance liability is recognized by persuasive authority from the Montana district court and the sister state to which the Montana Supreme Court looks for interpretive guidance.[23]

### c. Interference with Property Rights limitation

Defendants also assert that Plaintiff's product-related claims do not allege misuse or interference with land or real property interests, which they contend is required to state a cognizable public nuisance claim under Montana law. (R. 933-1, PageID# 21245-21250; R. 1089, PageID# 27235-23238). The Manufacturers state that Montana courts "almost invariably" interpret and apply the nuisance statute to protect against interference and enjoyment of real property. (R. 933-1, PageID# 21245-21249; R. 1089, PageID# 27235-27236, citing *State ex rel. Dep't of Envtl. Quality v. BNSF Ry. Co.,* 246 P.3d 1037, 1043 (Mont. 2010); *Graveley Ranch v. Scherping*, 782 P.2d 371, 373 (Mont. 1989); *State ex rel. Fields v. District Court of the First Judicial District of the State of Montana,* 541 P.2d 66, 67-68 (Mont. 1975); *Kasala v. Kalispell Pee Wee Baseball League*, 439 P.2d 65, 68 (Mont. 1968). Noting the FAC alleges "non-physical property damage and damage to [] proprietary interests" (R. 6, ¶946), the Distributors argue similarly that Plaintiff's failure to allege that any of its property has been "injuriously affected" by the Distributors' conduct mandates dismissal. (R. 924, PageID# 20998-999, citing *Sunburst*

---

[23] The court notes that the Montana Supreme Court found that an investigation of California nuisance law was not necessary in a case where its analysis was limited to a review of the trial court's jury instructions regarding Montana public nuisance law. *Tarlton v. Kaufman,* 199 P.3d 263, 269-270 (Mont. 2008). That reasoning does not apply to this court's determination on the issue discussed above. To the contrary, the *Tarlton* court also reasoned that the California decisions that defendants characterized as limiting nuisance liability would not apply to limit the definition of what constitutes a nuisance under Montana law because that definition was not "narrowed" by the Montana legislature. *Id.*

*Sch. Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1084 (Mont. 2007); *Knight v. City of Missoula*, 827 P.2d 1270, 1277–1278 (Mont. 1992)).[24]

As Plaintiff points out, even cases relied upon by the Defendants expressly acknowledge the "injurious to health" and "interference with enjoyment of life" provisions in the nuisance statute. *See, e.g., Kasala,* 439 P.2d at 68-69 (finding that owners of property near baseball field failed to establish that lights, noise, traffic, and flying balls "resulted in conditions which were injurious to health, *or* indecent, *or* offensive to the senses *or* were obstructions to the free use of property" nor were there "interferences created with the comfortable enjoyment of life or property") (emphasis added); *Dep't of Envtl. Quality,* 246 P.3d at 1043 (recognizing that "the District Court found that the contamination presents an imminent and substantial endangerment to the public health, welfare, and safety and to the environment," the court dismissed the claim for failure to demonstrate that the nuisance affected an entire community, neighborhood, or considerable number of persons at the same time); *Graveley Ranch*, 782 P.2d at 373 ("We conclude that the presence of exposed lead batteries on defendants' property resulting in a series of livestock deaths is potentially injurious to health and sufficiently interfered with plaintiff's use of property sufficient to constitute a nuisance under § 27-30-101, MCA."). Defendants cite no precedent either expressly limiting Montana nuisance claims to the property context or rejecting a nuisance claim for failure to allege misuse or interference with property.[25]

---

[24] Plaintiff maintains that the complaint does plead harm to its use and enjoyment of real property, in that Defendants are alleged to have caused "increased crime, property damage, and public blight" (R. 731, ¶22) and have "render[ed] the Nation's citizens insecure in their lives and the use of property" (¶¶427, 460). (R. 1008, PageID# 24019-24020). These allegations, alone, lack sufficient factual support to state a plausible claim against the Defendants. *See Iqbal,* 556 U.S. at 687 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting *Twombly*, 550 U.S. at 555, 557).

[25] The Distributors contend that Plaintiff cannot maintain a public nuisance claim because it is not a "person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance," citing M.C.A. 27-30-103. (R. 924, PageID# 20998, 20999 n. 15). The argument is not well taken because Montana law defines "person" as including "a corporation or other entity as well as a natural person" (M.C.A. 1-1-201(1)(b)). Similarly unpersuasive

24

Moreover, the plain language of the nuisance statute belies a conclusion that only claims alleging interference with a property right are actionable thereunder. M.C.A. 27-30-101. (R. 1017, PageID# 24624). The Montana cannons of statutory construction instruct as follows:

> Role of the judge -- preference to construction giving each provision meaning. In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.

Mont. Stat. Ann. 1-2-101.[26] The Montana Supreme Court has explained:

> Montana's definition of nuisance, which applies to both public and private nuisance claims, states clearly that "[a]nything which is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ... is a nuisance." Section 27–30–101(1), MCA. Except for limitations on farming operations and activities authorized by statute, the additional nuisance statutes set forth in Chapter 30 of the Montana Code Annotated do not provide further limitations on what may or may not constitute a nuisance in Montana. *See* Sections 27–30–101(2) through—(3), MCA.

*Tarlton v. Kaufman,* 199 P.3d 263, 269-270 (Mont. 2008) ("Since the Montana Legislature has not narrowed the definition of what constitutes a nuisance, we are not at liberty to do so here.").

To accept Defendants' position would be to "omit what has been inserted" and impose a limitation on what may or may not constitute a nuisance that the statute does not provide. *See id.*

---

is the Distributors' argument that *State of Montana v. Phillip Morris, Inc.* is inapplicable because it was brought by the State as a "public body" that is not bound by the requirements of M.C.A. 27-30-103. *See* M.C.A. 27-30-204 ("[a] public nuisance may be abated by any public body or officer authorized by law"). (R. 1084, PageID# 27024-27025). Distributors cite no authority for the proposition that the Blackfeet Nation, which alleges its status as a sovereign government, is any less a "public body" than the State. *See* (R. 6, ¶¶30-31).

[26] The Manufacturers state that "the Montana Supreme Court has refused to apply the literal language of the public nuisance statute to encompass the harm inflicted by a tree growing from one property owner's land onto that of another," citing *Martin v. Artis*, 290 P.3d 678, 690 (Mont. 2012). That interpretation of *Martin*, is not supported by the decision, which explained that while it is possible under the statute for "anything" to constitute a nuisance, a claimant must also plead "a factual foundation that satisfies the governing legal standards" requiring that the alleged nuisance-causing conduct is "'either intentional, negligent, reckless, or ultrahazardous,' 'an inherently injurious act,' or a condition which 'obviously exposes another to probable injury.'" The court held that the "assertion that [defendants'] naturally growing tree has obstructed [plaintiff's] view does not constitute, as a matter of law" such conduct.

Further demonstrating the viability of a public nuisance claim that does not arise in the context of a property dispute is *State of Montana v. Phillip Morris*, 1998 Mont. Dist. LEXIS 732, at *30. Quoting only the portion of the nuisance statute addressing injury to health and interference with the comfortable enjoyment of life, the court concluded that the alleged "methods utilized by the Defendants in marketing [their] products or suppressing information . . . adequately pled a cause of action for public nuisance and that it should not be dismissed." *Id.*[27]

The court has considered the plain language of M.C.A. 27-30-101, *et seq.*, Montana decisional law concluding that the statutory definition of nuisance is not limited, the Montana trial court's *State v. Phillip Morris* decision, California law to which Montana courts look for guidance, and decisions from other jurisdictions based on claims analogous to those pled by Plaintiff. Based on those legislative and judicial sources, the court concludes that the Montana Supreme Court would not hold that the definition of nuisance is limited to acts or conditions that interfere with property rights and that it would recognize as actionable a public nuisance claim that is based on a defendant's alleged affirmative misconduct in the manufacture, distribution and sale of the products at issue in this action.

### d. Immunity for Authorized Activity

Distributors assert that they cannot be held liable under an absolute nuisance theory because the Montana statute provides that "[n]othing that is done or maintained under the express authority of a statute may be deemed a public or private nuisance." (R. 924, PageID#

---

[27] *See also Ileto v. Glock Inc.,* 349 F.3d 1191, 1213 (9th Cir. 2003). There, quoting a provision of the California nuisance statute that is identical to statutory provision at issue here, the court explained, "California law has never imposed such a requirement that there be some form of an injury to land or property; indeed, as noted above, California common law consistently has defined nuisance in broad terms that encompass injuries to health, or acts that are "indecent or offensive to the senses" *or* obstructions to the free use of property in any manner that might interfere with the "comfortable enjoyment of life *or* property." *Id.* (emphasis in original) (citations omitted).

26

20997; R. 1086, PageID# 27023, quoting M.C.A. 2-20-101(2)). They reason that as licensed distributors of controlled substances, their activities are carried out with express statutory authorization and therefore they are not subject to nuisance liability. *Id.* Such immunity, however, applies only if it "can be fairly stated that the legislature contemplated the doing *of the very act* which occasions the injury." *Barnes v. City of Thompson Falls,* 979 P.2d 1275, 1278-1279 (Mont. 1999) (emphasis added) (internal quotation marks and citations omitted). (R. 1017, PageID# 24628-24629). The statutory authorization test, which requires a "'particularized assessment'" of the authorizing statute, serves to "ensure an 'unequivocal' legislative intent to sanction a nuisance while avoiding the uncertainty that would result were every generally worded statute allowed to immunize nuisance liability." *Tally Bissell Neighbors, Inc.*, 228 P.3d at 1140 (quoting *Barnes*, 979 P.2d at 1279). The FAC alleges that the nuisance-causing conduct exceeded defendants' statutory authority and violated federal and state controlled substances law and regulations——conduct that included the failure to maintain mandated anti-diversion controls and the distribution and sale of opioids in a manner that facilitated and encouraged their flow into illegal secondary markets. (*E.g.,* R. 6, ¶¶931-938, 966-967). The conclusion that DEA registrants are not statutorily authorized to undertake that alleged conduct is beyond dispute.

Distributors also argue that "an activity or condition can be an absolute nuisance if it is a nuisance even when performed or maintained without fault," and cite *Barnes,* 979 P.2d at 1278, for the proposition that the substance of an absolute nuisance "is not negligence." (R. 1084, PageID# 27023). The *Barnes* court explained that an absolute nuisance is "a nuisance, the substance ... of which is not negligence, which obviously exposes another to probable injury." Noting that absolute nuisance is "often" referred to as "nuisance per se", the court also explained that "a nuisance action may be based upon conduct of a defendant that is either intentional,

27

negligent, reckless, or ultrahazardous." *Id.* at 1278 ("[N]egligence is merely one type of conduct upon which liability for nuisance may be based."). Distributors cite no authority interpreting *Barnes* as limiting absolute public nuisance claims to those alleging strict, no fault liability. The FAC alleges that "each Defendant's liability for creating the alleged public nuisance is based on intentional and unreasonable and/or unlawful and/or negligent conduct." (*E.g.,* ¶¶930, 934, 952).

Distributors' assertion that the Plaintiff's alternatively pled negligence-based qualified nuisance claim is deficient, because the FAC does not demonstrate that they acted negligently, fails for the reasons discussed in *infra* regarding Plaintiff's negligence-based claims. (R. 924, PageID# 21000; R. 1084, PageID# 27026).

### e. Interference with a Public Right

Distributors and Pharmacies argue that Plaintiff fails to plead interference with a public right. (R. 924, PageID# 20999-21000; R. 1084, PageID# 27025; R. 927-1, PageID# 21072; R. 1085, PageID# 27046). Distributors assert that the claims derive solely from personal injuries in the form of opioid addiction suffered by some of Plaintiff's members and therefore implicate private rights only. They characterize the FAC as alleging an injury resulting from the misprescription of drugs, and argue that "whether because the drugs lack adequate warnings or are deceptively marketed," the injury is a "quintessentially personal" one that represents the invasion of a private right, not a public one. (R. 924, PageID# 21000; R. 1084, PageID# 27025). Plaintiff responds that the alleged common right does not depend on aggregating the rights of injured individuals, numerous as they may be, nor does it seek recovery based on or for those injuries, further contending that the same conduct may infringe on both public and private rights, which are distinct, but not mutually exclusive or contradictory. (R. 1017, PageID# 24618-24620).

28

The Distributors further argue that "public health" and "public right" are not synonymous, citing *Lead Indus. Ass'n,* for the proposition that lead poisoning constitutes a public health crisis, but does not involve public rights. 951 A.2d at 436, 447-448. There, unlike here, the court determined that the plaintiff's claims were based on an aggregation of personal injuries; sounded in products liability; failed to alleged control of the product, and that several statutory schemes existed to address the public health hazards caused by lead paint. *Id.* at 453. In contrast, the recent *ConAgra* decision, discussed above, construed the provision of California nuisance statute on which Section 27-30-101 is based and stated, "[t]he community has a collective social interest in the safety of children in residential housing…. and that [i]nterior residential lead paint interferes with the community's "public right" to housing that does not poison children"). *ConAgra,* 227 Cal. Rptr. 3d at 552. Moreover, decisions from courts in other jurisdictions addressing public nuisance claims against manufacturers and distributors of prescription opioids on facts analogous to those alleged herein have recognized that the alleged misconduct interfered with a public right. *In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018); *see also In re Opioid Litigation*, 400000/2017, at 13 (N.Y. Sup. Ct. July 17, 2018); *State of West Virginia, ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, 2014 WL 12814021, at *10 (Boone Cty. Cir. Ct., W. Va. Dec. 12, 2014). (R. 1017, PageID# 24618-24620 & Ex. 4).

The FAC pleads that the nuisance-causing conduct discussed above "created an ongoing, significant, unlawful, and unreasonable interference with the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiffs' Community." (R. 6, ¶¶963-967). Plaintiff further alleges that Defendants conducted their marketing, distributing, and sales activities "relentlessly and methodically, but untruthfully" misrepresenting the risks and benefits

29

of opioid treatment for long term pain management (*e.g.,* ¶¶10, 12); facilitated and encouraged illicit markets for diverted prescription opioids (*e.g.,* ¶¶9, 934), flooded Montana and the Blackfeet Reservation with more opioids than could be used for legitimate medical purposes, filling rather than reporting suspicious orders. (*e.g.,* ¶¶481, 542, 654, 921). The FAC also claims that Defendants' misconduct created what the U.S. Surgeon General deemed an "urgent health crisis," which was labelled a "public health epidemic" by the CDC and described by the DEA as having a "substantial and detrimental effect on the health and general welfare of the American people" (¶¶17, 503); that the epidemic has "severe and far reaching public health, social services, and criminal justice consequences" (*e.g.*¶¶19, 928) for which Plaintiff is bearing "necessary and costly responses" (¶¶19, 679, 674, 945, 1027); and that the epidemic's impact on the Blackfeet Nation is particularly devastating, citing addiction, overdoses, death, elder and child abuse and neglect and the lack of sufficient resources to address the problems. (¶¶681-700).

The moving defendants do not fulfill their burden to demonstrate that no rights common to the public are threatened by the consequences of what Plaintiff alleges is the "worst man-made epidemic in modern medical history." (R. 6, ¶2). The FAC plausibly pleads a public right to be free of those consequences, which are alleged to flow from the persistent and intentional misconduct of private parties. It also plausibly pleads an injury to health that interferes with the enjoyment of life and affects an entire community, neighborhood or considerable number of people as required by the Montana statute.

The Pharmacies assert that the FAC fails to support an inference that any of them interfered with a public right because there is no allegation that any of them "control which medications doctors prescribe, how patients use medications after they are dispensed, or any illegal means that the drug users might use to obtain opioids." (R. 927, PageID# 21072; R. 1085,

30

PageID# 27046). The argument misconstrues the public nuisance instrumentality, which, as discussed above is alleged to be the Defendants' conduct in carrying out their business activities, and not the product that they manufacture, distribute and dispense. *See, e.g., James v. Arms Tech., Inc.* 820 A.2d 27. 52-53 (N.J. 2003) ("[Defendants'] public nuisance liability stems from their marketing and distribution policies and practices, over which they have complete control."). (R. 1017, PageID# 24621). The FAC alleges that as CSA registrants the Pharmacies have obligations to provide controls against diversion and theft of controlled substances and that they failed to comply with those duties. (R. 6, ¶¶590-605). It further alleges that the Pharmacies had knowledge of the oversupply of prescription opioids "through the extensive data and information they developed and maintained as both distributors and dispensaries;" that ARCOS data confirms that the Pharmacies distributed and dispensed "substantial quantities of prescription opioids" in Montana; and that they "were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd." (¶¶586, 588, 589, 605). The FAC sufficiently alleges that Defendants, including the Pharmacies, had control over their own conduct, which allegedly caused and maintains the complained of public nuisance, *i.e.,*

> Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. Each of the Defendants controlled the systems they developed to prevent diversion, including the criteria and process they used to identify suspicious orders, whether and to what extent they trained their employees to report and halt suspicious orders, and whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

(¶940; *see also* ¶¶924, 932, 933, 966, 967).

The Pharmacies also contend that the FAC cannot be construed interfering with a public right because the  intervening acts of criminals and others prevent a finding that their conduct

directly resulted in the alleged harm. Montana law provides that a defendant is liable for wrongful conduct "if it is reasonably foreseeable that plaintiff's injury may be the natural and probable consequence of that conduct." *Thayer v. Hicks*, 793 P.2d 784, 795 (Mont. 1990); *Hinkle v. Shepherd Sch. Dist. No. 37,* 93 P.3d 1239, 1245 (Mont. 2004); (explaining that "the inquiry must be whether the defendant could have reasonably foreseen that his or her conduct could have resulted in an injury to the plaintiff" and that "[t]he particular resulting injury need not have been foreseeable"). As discussed above, the FAC alleges that the Pharmacies' dispensing practices "knowingly" allowed widespread diversion (R. 6, ¶¶586-605, 940) and that the nuisance—the opioid crisis—and the harm it caused was reasonably foreseeable. (¶¶33, 481, 941). Furthermore, as discussed in *Summit County* , arguments concerning intervening acts and foreseeability raise factual issues not appropriately resolved on a motion to dismiss. *E.g., Fisher v. Swift Transp. Co., Inc.* 181 P.3d 601, 610-611 (Mont. 2008); *see also Summit County*, R. 1025, PageID# 24888.

They further argue that the pleading does not comply with Fed. R. Civ. P. 9(b), stating that it does not identify any specific act by any of them occurring "in Montana – much less the Blackfeet Indian Reservation" that violated any law, interfered with any public right, particularly affected Plaintiff, or constituted pharmacy misconduct such as failures to keep records or inventory lists. (R. 927, PageID# 21072; R. 1085, PageID# 27046). Factual allegations citing enforcement and regulatory actions based on dispensing and recordkeeping violations against certain of the Pharmacies in other jurisdictions (R. 6, ¶¶606-628), however, suffice "'to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].'" *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016) (quoting

*Twombly,* 550 U.S. at 556).[28]

The Generic Manufacturers contend that Plaintiff's nuisance claims should be dismissed for failure to meet Fed. R. Civ. P. 9(b) requirements. (R. 930-1, PageID# 21160-70, 21176; R. 1091, PageID# 27411-27415).[29] They note the absence of "a single statement attributable to any of the Generic Manufacturers about one of their generic medicines; a single statement made by a Generic Manufacturer that reached a Montana doctor, a tribal citizen who received an opioid prescription, or Plaintiff itself, or any of the requisite details of any fraudulent conduct, such as who made an allegedly false statement, when, to whom, and why it is purportedly false.... [nor] a single factual allegation pled against any Generic Manufacturer regarding its failure to comply with any diversion monitoring or reporting allegations." (R. 1091, PageID# 27411- 27415). That level of specificity is not required at the pleading stage where the complaint provides sufficient factual content for the court to reasonably infer that the Manufacturer Defendants, including those that produce generic prescription opioids, are liable for the conduct that created the alleged public nuisance. *See Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 383 (citing *Iqbal*, 556 U.S. at 678). The FAC alleges that each Defendant is liable for nuisance-causing conduct, including deceptive marketing practices and violations of state and federally mandated duties to maintain diversion control systems, that fueled addiction to and/or diversion of opioids resulting in increased addiction and abuse, an elevated level of crime, death, injury, fear, discomfort, inconvenience,

---

[28] Defendants' additional arguments, asserting failure to comply with Fed. R. Civ. P. 9(b) and to establish proximate cause, do not mandate dismissal of the Plaintiff's nuisance claims for the reasons stated in *Summit County*. (R. 1025, PageID# 24832-24842, 24831 & nn. 19, 20, 24845-24946).

[29] The FAC does not identify "Generic Manufacturers" as a distinct defendant group—although the Plaintiff's opposition brief uses that phrase in response to the brief separately filed by Watson, Actavis Pharma, Actavis LLC, Par Pharmaceutical Inc., and Par Pharmaceutical Companies, Inc. as the "Generic Manufacturers," whose brief is joined by Mallinckrodt, SpecGx, and Teva USA "to the extent Plaintiff's claims rest on allegations regarding their generic products." (R. 6, ¶¶47-49, 74-78). (R. 930-1, PageID# 21164). The Generic Manufacturers' brief does not address the public nuisance claims separately, but rather as subject to the same global Rule 9(b) defenses it raises against all the other claims.

and direct costs to Plaintiff and its community. (*E.g.,* R. 6, ¶¶929-930). The allegations adequately inform the Defendants of the nature of the public nuisance claims and the grounds on which they rest. *See, e.g., Williams v. Duke Energy Int'l Inc.,* 681 F.3d 788, 803 (6th Cir. 2012). Furthermore, "[i]t is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery." *Id.*

Based on the foregoing regarding the Defendants' alleged affirmative misconduct, the court concludes that Plaintiff has pleaded plausible claims for relief under Counts Four and Five for public nuisance.

### E. Count Six: Negligence-based Claims

The elements of a cause of action for negligence in Montana are (1) duty; (2) breach of that duty; (3) causation; and (4) damages. *Gourneau ex rel. Gourneau v. Hamill*, 311 P.3d 760, 762 (Mont. 2013). All Defendants challenge the sufficiency of the FAC with respect to the first and third elements; and Distributors also challenge the second element. In *Summit County*, the court concluded that the plaintiffs had pled sufficient facts to plausibly make out a claim that all the defendants owed them a duty of care. (R. 1203, PageID# 29052-54). Further, the court also concluded that the plaintiffs had pled facts sufficient to support their claim that the defendants' negligent actions had proximately caused the plaintiffs' alleged harm. (R. 1025, PageID# 24885-88). The parties have not identified, and the court has not found, Montana authority that would alter that conclusion. Plaintiff has plausibly alleged a duty of care owed by all the Defendants and to satisfy the proximate cause element of the negligence action at the pleading stage.

The Distributors argue that Plaintiff has failed to allege any facts indicating that they breached any alleged duty to "report and halt suspicious orders." (R. 924, PageID# 21007-08). The court disagrees. The FAC alleges that Defendants, including Distributors, "breached their

duty to Plaintiff by, *inter alia*: "Distributing and selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;" "Distributing and selling opioids without maintaining effective controls against the diversion of opioids;" "not…effectively monitor[ing] for suspicious orders;" "not…investigat[ing] suspicious orders;" "not…report[ing] suspicious orders;" "not…stop[ping] or suspend[ing] shipments of suspicious orders;" and "Distributing and selling opioids prescribed by 'pill mills' when Defendants knew or should have known the opioids were being prescribed by 'pill mills.'" (R. 6, ¶988). The FAC further alleges that the Defendants, responsible for "monitoring the movements of controlled substances" (*Id.*, ¶671), "did not stop the pill mills from operating, and to the contrary encouraged their activity by . . . continuing to supply excessive quantities of opioids." (*Id.,* ¶ 672). According to the FAC, Distributors possessed sufficient information to be aware of suspicious orders (*Id.*, ¶539), but still "flooded communities with opioids in quantities that they knew or should have known exceeded any legitimate market for opioids – even the wider market for chronic pain."  (*Id.*, ¶542).

The court is satisfied, on the basis of these allegations, that Plaintiff has plausibly alleged that Distributors have breached their duty of care. The motions to dismiss the negligence claim should, therefore, be denied.

Count Six also raises negligent misrepresentation and negligent *per se* theories.[30] "'Negligent misrepresentation has a lesser standard of proof than fraud. Rather than requiring an intent to misrepresent, it requires a showing of a failure to use reasonable care or competence in obtaining or communicating the information.'" *Hayes v. AMCO Ins. Co*., No. CV 11-137-M-DWM, 2012 WL 5354553, at *4 (D. Mont. Oct. 29, 2012) (quoting *Barrett v. Holland & Hart,*

---

[30] It is not necessary to address Defendants' arguments with regard to negligence *per se*, because the court finds Plaintiff has sufficiently pleaded a plausible common law duty.

845 P.2d 714, 717 (Mont 1992)). Montana law imposes the following elements for a negligent

misrepresentation claim:

> a) the defendant made a representation as to a past or existing material fact;
>
> b) the representation must have been untrue;
>
> c) regardless of its actual belief, the defendant must have made the representations without any reasonable ground for believing it to be true;
>
> d) the representation must have been made with the intent to induce the plaintiff to rely on it;
>
> e) the plaintiff must have been unaware of the falsity of the representation; it must have acted in reliance upon the truth of the representation and it must have been justified in relying upon the representation;
>
> f) the plaintiff, as a result of its reliance, must sustain damage.

*Morrow v. Bank of Am., N.A.*, 324 P.3d 1167, 1180 (Mont. 2014).

The FAC alleges extensively that Manufacturers made false statements misrepresenting

the risks and benefits of treating chronic pain with opioids, citing representative examples of

such misstatements. (R. 6, ¶¶144-468). It further alleges that Distributors gave public false

assurances of their compliance with anti-diversion obligations and cooperation with law

enforcement, "affirmatively seeking to convince the public that their legal duties to report

suspicious sales had been satisfied," citing instances of allegedly untrue statements of fact. (*Id*. at

¶¶574-585, 726, 799-827, 1039-1040). Alleging that these falsehoods "misled regulators,

prescribers and the public including Plaintiff, and deprived Plaintiff of actual or implied

knowledge of facts sufficient to put Plaintiff on notice of potential claims," the FAC further

states that Defendants intended that Plaintiff would rely on the false statements and that Plaintiff

had no means to know the truth. (¶¶723-731, 1041-1047).  "There is a right to rely when the

parties are not on equal footing and do not have equal means of knowing the truth." *Brown v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 640 P.2d 453, 459 (Mont. 1982) (internal quotation

marks and citation omitted).

36

Manufacturers contend that the negligent misrepresentation claim is preempted to the extent it is based on inadequate disclosure of opioid risks. (R. 933-1, PageID# 21256, citing *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 479 (4th Cir. 2014) (holding that "negligent misrepresentations and fraudulent[] conceal[ment]" claims are preempted because they "are premised on the content of statements made by the defendant to the plaintiff")). The assertion fails as discussed, *supra*, in the court's preemption analysis. They further assert, as do the Pharmacies, that the claim fails to comply with Fed. R. Civ. P. 9(b). (R. 1089, PageID# 21260-21266; R. 927-1, PageID# 21077-21078; R. 1085, PageID# 27048-27049). As discussed *supra,* the conclusion in *Summit County*—that the plaintiffs' allegations satisfied Rule 9(b)—applies to Plaintiff's pleading for the same reasons. (R. 1025, PageID# 24831 & nn. 19, 20, 24845-24849 & n. 30).

The Distributors and Pharmacies argue that the claim is deficient for failure to allege a misrepresentation that was directed at Plaintiff, but they cite no Montana case holding that a failure to plead first-party reliance or direct communication mandates dismissal of a negligent misrepresentation claim. Similarly unpersuasive are their assertions that the elements of justifiable reliance and resulting injuries are deficiently pled. (R. 924, PageID# 21008-21009, R. 1084, PageID# 27030; R. 927-1, PageID# 21077-21078; R. 1085, PageID# 27048-27051). These elements involve issues of fact not appropriately resolved on a motion to dismiss. *See, e.g., Morrow v. Bank of Am., N.A.,* 324 P.3d 1167, 1181 (Mont. 2014).

Distributors' argument that the FAC is deficient for failure to allege that any of them misrepresented the risks of benefits of opioids is not well taken. The FAC amply alleges that the Distributors falsely claimed that they were complying with their anti-diversion responsibilities and cooperating with law enforcement officials to curb the epidemic. The Distributors' reliance

on the assertion that the Montana Supreme Court "held that a negligent misrepresentation claim requires plaintiff to point to a specific false statement the defendant allegedly made" overstates the significance of that decision. *Osterman v. Sears, Roebuck & Co.* is an opinion addressing the sufficiency of evidence introduced at trial, not dismissal of a claim on a motion to dismiss. 80 P.3d 435 (Mont. 2003).

The Pharmacies argue that the negligent misrepresentation claim fails "because Plaintiff does not point to any representations by any of the [Pharmacies] *to Plaintiff.*" (R. 927-1, PageID# 21077) (emphasis added).[31] Plaintiff points to its allegation that *all* Defendants "misleadingly portrayed themselves as cooperating with law enforcement and actively working to combat the opioid epidemic" and misrepresented their compliance with their legal duty to report suspicious orders. (R. 1017, citing R. 6, PageID# 1039). The FAC also alleged that every Defendant "affirmatively assured the public, including the State, the Plaintiff, and Plaintiff's Community, that they are working to curb the opioid epidemic" and made "public assurances that they were working to curb the opioid epidemic." (R. 6, ¶¶723, 726). Furthermore, each of the Pharmacies is also identified as a "Distributor Defendant." (¶¶ 86-88, 95-96). It is alleged that the Distributor Defendants "made broad promises to change their ways and insisted that they sought to be good corporate citizens," and also "publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs.," (¶¶574-575). At this stage of the proceedings, Plaintiff has sufficiently pled the elements of a negligent misrepresentation.

---

[31] In their Reply, the Pharmacies assert that even if Plaintiff adequately alleged misrepresentations on their part, the Plaintiff, nonetheless, failed to adequately plead that it relied on those misrepresentations to its detriment. (R. 1085, PageID# PageID# 27050). As stated above, the element of reliance is an issue of fact not appropriately resolved at this stage.

### F.  Count Seven: Common Law Fraud

Manufacturers, including the Generic Manufacturers, move to dismiss Plaintiff's common law fraud claim on the grounds that the FAC fails to demonstrate that the injuries alleged were proximately caused by their own wrongful conduct; fails to comply with Fed. R. Civ. P. 9(b); is preempted; time-barred; and seeks damages based on health care and municipal costs that are not recoverable.[32]

Under Montana law, proximate cause depends on a defendant's ability to reasonably foresee the "natural and probable consequence" of the alleged wrongful conduct and is generally considered an issue to be determined by the trier of fact.  *E.g., Thayer v. Hicks,* 793 P.2d 784, 795 (Mont. 1990); *Fisher v. Swift Transp. Co., Inc.,* 181 P.3d 601, 610-611 (Mont. 2008). These pleading standards are no more stringent than those governing the court's federal RICO causation analysis in *Summit County*, which therefore applies here. *See Perry v. Am. Tobacco Co., Inc.,* 324 F.3d 845, 850 (6th Cir. 2003).[33] Reviewing allegations in the *Summit County* complaint that are virtually identical to those asserted herein, the court concluded that Plaintiff's

---

[32] The Manufacturers' arguments are set forth in the following sections of their moving and reply briefs: proximate cause (R. 933-1, PageID# 21215-21228; R. 1089, PageID# 27207-27219); Fed. R. Civ. P. 9(b) (R. 933-1, PageID# 21260-21269; R 1089, PageID# 27246-27252); preemption (R. 933-1, PageID# 21253-21259; R. 1089, PageID# 27243-27246); statute of limitations (R. 933-1, PageID# 21269-21277; R.1089, PageID# 27252-27260); recovery of health care costs (R. 933-1, PageID# 21230-21234; R. 1089, PageID# 27219-27224); and recovery of municipal costs (R. 933-1, PageID# 21234-21236; R. 1089, PageID# 27224-27226). Manufacturers refer to Manufacturers' Joint brief in the *Summit County* action, R. 499-1, § II.B.4.b and R. 746, § V.B.2.a. (R. 933-1, PageID# 21261, 21268). The Generic Manufacturers, moving separately, adopt and incorporate arguments set forth in the following briefs: Manufacturers' Joint briefs in this action (R. 933-1; R. 1089); Generic Manufacturers' briefs in the *Muscogee Nation* action (R.929-1; R. 1090). (R. 930-1, PageID# 21164 n.2; R. 1092, PageID# 27414).

Plaintiff's counter-arguments are set forth in the following sections of their opposition brief: proximate cause (R. 1017, PageID# 24576-24592); Fed. R. Civ. P. 9(b) (*id.*, PageID# 24591-24608); preemption (*id.*, PageID# 24555- 24569); statute of limitations (*id.*, PageID# 24569-24575); recovery of health care costs (*id.*, PageID# 24551-24555); and recovery of municipal costs (*id.*, PageID# 24575-24576).

[33] The *Perry* court explained that a "claim-by-claim" causation inquiry was not necessary in light of "*Holmes'* emphasis that the RICO statute incorporates general common law principles of proximate causation, 503 U.S. at 267."  324 F.3d at 850 ("The same principles that lead us to conclude that plaintiffs' antitrust and RICO claims were properly dismissed lead to the inevitable conclusion that their state law claims must also fail.") (internal quotation marks and citation omitted).

federal RICO claims sufficed to plead proximate cause. (R. 1025, Page ID# 24832-24842; R. 1203, PageID# 29026-29029). The court's prior determination that the *Summit County* complaint satisfied Rule 9(b) also applies to Plaintiff's pleading of Count VII. (R. 1025, PageID# 24845-24850). The moving defendants fail to demonstrate that any of the arguments they raise mandates dismissal of the Blackfeet Nation's common law fraud claim.

### G.  Count Eight: Unjust Enrichment

Plaintiff has plausibly alleged a claim for unjust enrichment. Under Montana law, "[t]he essential elements of an unjust enrichment claim are: (1) a benefit conferred on one party by another; (2) the other's appreciation or knowledge of the benefit; and (3) the other's acceptance or retention of the benefit under circumstances that would render it inequitable for the other to retain the benefit without compensating the first party for the value of the benefit." *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 167 (Mont. 2018); *Darty v. Grauman*, 419, P.3d 116, 119 (Mont. 2018); *N. Cheyenne Tribe v. Roman Catholic Church*, 296 P.3d 450, 457 (Mont. 2013) (observing that "the concept of unjust enrichment plays an important role as a tool of equity: unjust enrichment law developed to remedy injustice when other areas of the law could not, and, therefore, must remain a flexible and workable doctrine") (internal citations omitted); *see also* 66 Am.Jur.2d *Restitution and Implied Contracts* § 11.

According to the FAC, "Plaintiff has paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products. Because of their deceptive marketing of prescription opioids, Marketing Defendants obtained enrichment they would not otherwise have obtained." (R. 6, ¶1080). Moreover, it alleges "Defendants obtained enrichment they would not otherwise have obtained" because of their "conscious failure to exercise due

diligence in preventing diversion." *Id.* All the Defendants challenge Plaintiff's externalities theory, with the Pharmacies maintaining that it "fails as a matter of law" (R. 924, PageID# 21009), and is not recognized in Montana. (R. 1084, PageID# 27031; R. 1085, PageID# 27051; *see also* R. 933-1, PageID# 21250-53).

In *Summit County*, the court determined that the plaintiffs had stated a facially plausible claim for unjust enrichment based on the theory that they had unjustly enriched the defendants by paying the costs of their negative externalities. (R. 1203, PageID# 29055-57, R. 1025, PageID# 24897-24901). The Blackfeet Nation's unjust enrichment claim herein is based on the same theory and similar allegations. The parties have not identified, and the court has not found any Montana authority indicating that Montana courts would reject this theory. Consequently, the court concludes that the FAC alleges a plausible claim for unjust enrichment.

### H.  Count Nine: Civil Conspiracy

Plaintiff alleges each defendant participated in a civil conspiracy. Under Montana law, a civil conspiracy claim requires a plaintiff to establish the following elements: "(1) two or more [conspiring] persons . . . .; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Sullivan v. Cherewick*, 391 P.3d 62, 67 (Mont. 2017) (quoting *Schumacker v. Meridian Oil Co.,* 956 P.2d 1370, 1373 (Mont. 1998). Defendants each move to dismiss the civil conspiracy claim, arguing that Plaintiff has failed to allege sufficient facts to show a meeting of the minds and failed to allege any unlawful overt acts.  (R. 924, PageID# 21011-12; R. 927-1, PageID# 21079-80; R. 933-1, PageID# 21278). In addition, the Pharmacies and Distributors argue that Plaintiff has not alleged that any wrongful conduct has proximately caused their alleged harm. (R. 924, PageID# 21012; R. 927-1; PageID# 21079).

41

The court has considered and rejected similar arguments raised by the defendants in *Summit County*, namely that the plaintiffs had failed to allege "unlawful acts" and "conspiratorial agreement." (R. 1025, PageID# 24901-04). Therein, the court concluded that the plaintiffs therein had plausibly pleaded such a claim. *Id*. The requirements for civil conspiracy in Montana are similar to those in Ohio.[34] The parties have not identified, and the court has not found any Montana authority suggesting a different result in this case. Therefore, the court concludes, in accordance with the aforementioned decision in *Summit County*, that the Blackfeet Nation has sufficiently pleaded a claim for civil conspiracy against all Defendants.

## I.  Count Ten: Montana Consumer Protection Act

Plaintiff's Tenth Claim for Relief alleges violations of the Montana Consumer Protection Act ("MCPA") by all Defendants. (R. 6, PageID# 860-64). The MCPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MCA § 30-14-103. All Defendants have moved to dismiss this claim, asserting not only that they have not violated the statute, but that the Blackfeet Nation is not a proper plaintiff with standing under the MCPA. (R. 924, PageID# 21012-14); R. 933-1, PageID# 21240-42; R. 927, PageID# 21081-84). The Court agrees.

The MCPA allows a private cause of action to be brought by "consumers," which the statute defines as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes." Mont. Code § 30-14-102(1); *See Fink v. Meadow Lake Estates Homeowners' Ass'n*, 384 Mont. 552, 2016 WL 2668136 (May 10, 2016). Defendants assert that Plaintiff is not a consumer, and Plaintiff's Opposition makes no

---

[34] Ohio requires: "(1) a malicious combination; (2) two or more person; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Hale v. Enerco Grp., Inc.*, 2011 WL 49545, at *5 (N.D. Ohio Jan. 5, 2011) (citation and internal quotation marks omitted).

effort to argue otherwise. Rather, Plaintiff contends, without citing any Montana law, that it has *parens patriae* standing to sue to enforce the MCPA on behalf of its collective citizens. (R. 1017, PageID# 24548). That assertion, however, runs contrary to the plain language of the MCPA. In addition to authorizing individual consumer claims, the MCPA expressly bars class actions. Mont. Code § 30-14-133. Furthermore, the MCPA grants specific statutory authority for enforcement actions by the Montana Department of Justice in the name of the State of Montana,[35] plus, in some circumstances, by Montana county prosecutors.[36] The MCPA grants no other governmental entity the power to sue to enforce violations. As such, the Montana legislature expressed a clear policy judgment in determining which governmental actors could sue to protect consumer rights under the MCPA. Plaintiff's Opposition cites no authority that persuades this court that its claim is viable.

The court, therefore, concludes that Plaintiff is not a proper party under the MCPA because Plaintiff it is not a consumer, lacks statutory authority to sue, and even if it had *parens patriae* authority, such a suit would violate the statute's bar against collective actions. Count Ten should be dismissed.

---

[35] "Whenever the department has reason to believe that a person is using, has used, or is about to knowingly use any method, act, or practice declared by 30-14-103 to be unlawful and that proceeding would be in the public interest, the department may bring an action in the name of the state against the person to restrain by temporary or permanent injunction or temporary restraining order the use of the unlawful method, act or practice upon giving appropriate notice to that person." Mont. Code § 30-14-111(1).

[36] "It is the duty of the county attorney to lend the department the assistance that the department may request in the commencement and prosecution of actions pursuant to this part. The county attorney, on request of the department or another county attorney, may initiate all procedures and prosecute actions in the same manner as provided for the department. If an action is prosecuted by the county attorney alone, the county attorney shall notify the department as to the nature of the action and the parties to the action within 30 days of the filing of the action. The county attorney shall report on the action to the department within 30 days of the final disposition of the matter." Mont. Code § 30-14-121.

### IV. Conclusion

For the foregoing reasons, it is recommended that the motions to dismiss be GRANTED in part and DENIED in part. Specifically, it is recommended that Plaintiff's federal common law public nuisance claim in Count Three be DISMISSED, that the claim arising pursuant to the Montana Unfair Trade Practices and Consumer Protection Act contained in Count Ten be DISMISSED, and that Plaintiff's claims against the Generic Manufacturers are partially preempted to the extent they are based on a narrow category of conduct as explained in Section III.C.2, *supra*. In all other respects, it is recommended that the motions to dismiss be DENIED.

s/ David A. Ruiz
David A. Ruiz
United States Magistrate Judge

Date: April 1, 2019

### OBJECTIONS

As set forth in the Court's *Summit County* Orders regarding Objections to Report and Recommendation (R. 1032; 1048), unless otherwise ordered by the Court, Manufacturer Defendants shall coordinate to file a single document addressing objections common to all manufacturing defendants, Generic Manufacturer Defendants shall coordinate to file a single document addressing objections common to all generic manufacturing defendants, Distributor Defendants shall coordinate to file a single document addressing objections common to all distributor defendants, Pharmacy Defendants shall coordinate to file a single document addressing objections common to all pharmacy defendants, and the PEC shall file a single document addressing objections common to all plaintiffs. Defendants filing Objections to the R&R are directed to collaborate with other co-defendants also filing Objections in order to prevent duplicative arguments on the same issue. For example, Manufacturer, Generic Manufacturer, Distributor, and Pharmacy Defendants shall coordinate to avoid objecting to the same issues.

The Court will also accept Responses to the Parties' Objections. All Defendants are directed to coordinate with one another to file a single Response to Plaintiffs' Objections. Plaintiffs are directed to file a single Response that addresses the Objections of all the above-classes of Defendants.

Page limits for the Parties' Written Objections are hereby set to 15 pages for each class of defendant, and 10 pages for Plaintiffs. Alternatively, all Defendants may file a single, omnibus 60-page filing of Written Objections. Page limits for the Parties' Responses are set to 10 pages for both Plaintiffs and Defendants.

       Due to the collaboration requirement, the Parties are hereby granted an extension of time to file their Objections and Responses. The Parties' Objections are due no later than 5:00 pm ET on Monday, April 29, 2019. The Parties' Responses are due not later than 5:00 pm ET on Thursday, May 9, 2019.